## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **M.A.,** *an individual,* | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action 2:19-cv-00849** |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | **Magistrate Judge Elizabeth P. Deavers** |
| **WYNDHAM HOTELS AND,** | : | |
| **RESORTS, INC.,** *et al.,* | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter comes before this Court on three motions for summary judgment by Defendants MGH Hospitality, LTD's ("MGH"); Ash Management Corp. ("Ash"); and S&S Airport Motel, LLC's ("S&S"); and Plaintiff M.A.'s Motion for Leave to File a Sur-Reply in support of summary judgment. (ECF No. 577). For the following reasons, this Court **GRANTS** Plaintiff's Motion for Leave to File a Sur-Reply (ECF No. 577) and **DENIES** Defendants MGH, Ash, and S&S's Motions for Summary Judgment (ECF Nos. 551, 558, 559).

## INTRODUCTION

There are over 70 civil lawsuits in this district seeking to hold hotels liable for sex trafficking under the Trafficking Victims Protection Reauthorization Act ("TVPRA").[1] In that

---

[1] Congress passed the Trafficking Victims Protection Act in 2000 which, among other things, created federal criminal offenses for sex trafficking. *See* Trafficking Victims Protection Act of 2000, Pub. L. No. 106–386, 114 Stat. 1464 (Oct. 28, 2000) (as codified and amended in 18 U.S.C. §§ 1589, 1590, 1591). It has since reauthorized and amended the law numerous times, including by adding a civil liability provision in 2003, *see* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, 117 Stat. 2875 (Dec. 19, 2003), and expanding civil liability in 2008, *see* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, 122 Stat 5044 (Dec. 23, 2008) (as codified and amended in 18 U.S.C. § 1595). For clarity, and unless otherwise stated, this Court refers collectively to these laws, including subsequent reauthorizations and amendments, as the "TVPRA."

swelling docket of cases, this case marks the first. Between 2013 and 2015, M.A. alleges that she was trafficked for sex by two men—L.R. and L.W.—at various hotels in or around the Columbus, Ohio area. L.W. was subsequently charged of, and pled guilty to, trafficking M.A. in violation of the criminal sex trafficking statute, Section 1591.[2] In 2017, this Court sentenced him to 15 years in federal prison and a life term of supervised release.

Two years later, M.A. filed this lawsuit against the various hotels in which she was trafficked, seeking to hold them liable for trafficking under Section 1595, the civil liability arm of the TVPRA. That provision, as amended in 2008, allows a "victim of a violation" of the TVPRA to sue perpetrators of TVPRA violations, or those who "knowingly benefit" from "participation in a venture" that they "knew or should have known" were "engaged in an act in a violation" of the TVPRA. *See* 18 U.S.C. § 1595(a). Not long after she filed suit, several hotel defendants moved

---

[2] 18 U.S.C.A. § 1591. Section 1591 provides, in relevant part:

**(a)** Whoever knowingly--

**(1)** in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

**(2)** benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C.A. § 1591.

to dismiss her claims. In an opinion that has since been widely cited,[3] this Court denied the motions, finding that Plaintiff plausibly alleged that the hotels "knowingly benefitted" from "participat[ing] in [] venture[s]" that they "knew or should have known" were "engaged in [] act[s] in violation" of the TVPRA. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019).

Since that decision, the number of TVPRA claims against hoteliers has skyrocketed, both in this district and nationwide.[4] Perhaps in an effort to quell the onslaught of cases, some courts have taken the view that, despite the statute's plain text, beneficiary liability under Section 1595 requires something more—whether by way of "benefit," "participation," or "knowledge."

MGH, Ash, and S&S, the three remaining defendants who now move for summary judgment, urge this Court to follow suit. They argue, among other things, that the TVPRA does not "impose a legal duty for any business to stop or even to prevent human trafficking," nor does it punish "generally not knowing or understanding signs of human trafficking." (ECF No. 551 at 2–3). Faced with the statutory language that plainly provides liability for what they *should have known*, Defendants maintain that M.A. "did not ask anyone for help or alert [us] that she was a victim." (ECF No. 558 at 17). Unable to gain traction with the statutory text, Defendants trot out a parade of horribles. This includes fears of "hold[ing] ordinary hotel operators to a significantly

---

[3] *See e.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023) (citing *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019)); *K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 642 (E.D. Mich. 2024) (same); *Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 775 n.13 (C.D. Cal. 2024) (outlining cases that have "adopted the *M.A.* court's reasoning"); *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1061 (D. Colo. 2021); *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1295 (M.D. Fla. 2021); *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 426 (N.D. Tex. 2021); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 935–39 (D. Or. 2020) (same); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 183 (E.D. Pa. 2020); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 153 (E.D.N.Y. 2020).

[4] *See In re Hotel Indus. Sex Trafficking Litig. (No. II)*, 730 F. Supp. 3d 1360, 1360–61 (U.S. Jud. Pan. Mult. Lit. 2024) (denying motion to centralize hotel TVPRA litigation consisting of "52 actions pending in twelve districts" and noting "61 additional actions pending in 22 districts" alleging the same).

higher standard than trained law enforcement and medical providers" (ECF No. 551 at 21) and "impos[ing] an intolerable and unworkable burden upon hotel operators throughout the country." (ECF No. 559 at 14).

Hyperbole, however, is not reasoning, and Defendants' reasoning is ill-informed. Contrary to their arguments, two and a half of decades of antitrafficking policy and legislation have centered on a "3 P's" paradigm: prosecution, *prevention*, protection.[5]  The Trafficking Victims Protection Act of 2000 marked the beginning.[6]  With each amendment and reauthorization since, Congress has repeatedly and deliberately chosen to expand the scope of liability for sex trafficking conduct.[7] The wisdom underlying the civil liability provision is two-fold: it supports antitrafficking government efforts by empowering and incentivizing victims to sue for trafficking violations

---

[5] *See* U.S.  Dep't of State, Trafficking in Persons Report 5 (2009) ("The most recent amendments to the TVPA were enacted in December 2008.  The purpose of the law is to punish traffickers, protect victims, and prevent trafficking from occurring.").

[6] *See* Trafficking Victims Protection Act of 2000, Pub. L. No. 106–386, 114 Stat. 1464 (Oct. 28, 2000).

[7] *See e.g.*, Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, 117 Stat. 2875 (Dec. 19, 2003) (adding civil liability provision that allows a victim of "violation of sections 1589, 1590, and 1591" to "bring a civil action against the perpetrator"); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, 122 Stat 5044 (Dec. 23, 2008) (expanding civil provision to allow victim of any "violation of this chapter" to bring civil action against both perpetrators and beneficiaries and lowering *mens rea* standard in criminal sex trafficking to include "reckless disregard of the fact, that means of force, threats of force, fraud"); Justice For Victims of Trafficking Act Of 2015, PL 114-22,  129 Stat 227 (May 29, 2015) (adding "advertising" to criminal sex trafficking conduct and extending statute of limitations for minors in civil actions); Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat 1255 (April 11, 2018) (defining "participation in a venture" for criminal sex trafficking and authorizing state attorneys general to bring civil action as "parens patriae" based on sex trafficking violations);adding "advertising" to criminal sex extending statute of limitations for minors in civil actions); Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat 1255 (April 11, 2018) (authorizing state attorneys general to bring civil action as "parens patriae" based on sex trafficking violations); Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, 136 Stat. 6199 (Jan. 5, 2023) ("clarifying" that civil liability extends to anyone who "attempts or conspires to benefit" from a violation of the TVPRA).

irrespective of criminal prosecution for those violations,[8] and it targets the financial motivations and the infrastructure that allows trafficking organizations to thrive.[9]

In the sex trafficking industry, that infrastructure begins and ends with physical spaces. Sex trafficking ventures cannot operate without access to physical spaces. So, it follows that providing traffickers with a room is providing them with an essential place of business. That is "participation." This is not a radical take. Without the room, there would be no trafficking. Nor is it cause for alarm. Because even then, the TVPRA attaches no civil liability unless the person or entity providing the room did so in exchange for a "benefit" and "knew or should have known" that the room was part of a venture engaged in acts that violate the TVPRA. Receiving payment for the room is the "benefit." So, that leaves "knowledge," which can be either "actual" or "constructive." The relevant question is not, as MGH puts it, what Defendants generally knew or understood about signs of human trafficking. It is, at a minimum, what they *should have known* based on the totality of the circumstances and the information available to them. As in other areas of law, the inquiry of knowledge is a fact-intensive one and best reserved for the jury.

Thus, for reasons explained more fully below, this Court DENIES MGH, Ash, and S&S's motions for summary judgment. (ECF Nos. 551, 558, 559).

---

[8] Charles Doyle, Cong. Research Serv., R40190, *The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110–457): Criminal Law Provisions*, 15–16 (2009) (describing Section 1595 as "creat[ing] civil liability both for those who face criminal liability for their profiteering and those who do not").

[9] *Combating Modern Slavery: Reauthorization of Anti-Trafficking Programs: Hearing on H.R. 3887 Before the H. Comm. on the Judiciary*, Serial No. 110–83, 110th Cong. 95 (2007) (testimony of Marcy M. Foreman, Director of the Office of Investigations, U.S. Immigration and Customs Enforcement, Department of Homeland Security, describing ongoing "effort[s] to not only find and rescue victims but to target and cripple the financial motivations and infrastructure that allow human trafficking organizations to thrive").

## I.     BACKGROUND

As a threshold matter, this Court notes that Defendants raise numerous objections to Plaintiff's evidence in their replies. (*See generally* ECF Nos. 570, 571, 572).  The majority of the evidence to which Defendants object, however, is not material to the court's analysis, so not all objections will be addressed.  *See In re Nat'l Century Fin.  Enters., Inc.*, 846 F.  Supp. 2d 828, 846 (S.D. Ohio 2012) (discussing only objections "that relate to evidence . . . relied on in resolving the motion for summary judgment" and "defer[ring] decisions on the admissibility of other evidence to the trial court").  Rather, this Court will address the relevant objections within the footnotes as they arise.

Having evaluated the evidence presented by the parties most favorably to Plaintiff as the non-moving party, the facts set forth herein are deemed relevant and true for the limited purpose of evaluating Defendants' motions for summary judgment.  *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("In evaluating the evidence presented, a court must draw all inferences in the light most favorable to the non-moving party."  (citing *Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).

### A.  M.A.'s Trafficking

Like many sex trafficking victims, M.A. had a troubled upbringing. (*See* M.A. Dep. 197:24–201:13, ECF No. 550).  She was homeless for bouts of time as a teenager and recalls particularly traumatic experiences at the hands of family members. (*Id.* at 197:24–198:6).  At seventeen, her unstable housing situation led her to L.R.—her first trafficker.

In the fall of 2013, L.R. coerced M.A. into commercial sex to pay for lodging. (*Id*. at 265:22–266:1-12).  When she tried to refuse, L.R. locked her in a room, deprived her of food, and physically abused her for days until she "finally caved."  (*Id.* at 266:8–12).  Over the next six or

seven months, L.R. psychologically manipulated and groomed M.A. for sexual exploitation. (*Id.* at 423:24–424:6). He would post photographs of her on Backpage.com, wait for people to contact him, and then transport M.A. to various hotels to perform commercial sex. L.R. would give M.A. a room key and direct her to the room to meet the "john." (*Id*. at 66:3–15)). M.A. testified that "[f]rom Day 1," there were 30 to 40 people coming to one hotel room in a single day. (*Id.* at 435:22–23).

M.A. successfully escaped L.R. sometime in the spring of 2014, when a "john" responded to one of the online ads and. (*Id.* at 60:18 –61:1; 91:12–23). That "john" was L.W., who became Plaintiff's second trafficker. He met M.A. at L.R.'s "home base": the Days Inn Columbus North on 1212 E. Dublin Granville Road, Columbus, OH ("Ash Property"). (*Id.* at 260:22–24). When he arrived, Plaintiff recalls that "[h]e really didn't want much"; "[h]e wanted to sit and talk." (ECF No. 550 at 91:17–23). Promising to "get [her] out and help [her]," L.W. instead trapped M.A. in his own trafficking venture for another year. (*See id.* at 91:12–96:23).

M.A. finally broke free of L.W. in August 2015. (*Id.* at 99:4-21). He instructed her "to go put money in the bank down the street . . . to pay some kind of bill." (*Id.*). When she came back, she "somehow wrecked [L.W.'s car] through the garage wall." (*Id.*). L.W. "started freaking out, saying the [leasing] office was going to trip," so M.A. told him she'll "go talk to them." (*Id.* at 100:2–5). In reality, M.A. was fearful that L.W. would kill her for damaging the car, so she decided to flee: "That's when I realized that it's time to go. If I didn't get out that day, he probably would have killed me." (*Id.* at 99:16–19). When she got to the leasing office, she contacted her father who picked her up. (*Id*. at 209:19-22).

In those two years she was trafficked, M.A. recalls being treated by both L.R. and L.W. "like a slave." (*Id.* at 66:23-67:2). She was beat "in the face, [in] the body"; "beat with extension

cords"; "beat with jump ropes." (*Id.* at 67:11–24). She was "pistol-whipped," "pulled out of vehicles," and "beaten in a park like [she] was a full-grown man." (*Id.*). She was "withheld food"; "refused contact with the outside world and [her] family"; and "threatened that nobody would find [her] body." (*Id*. at 66:23-67:7).

As a result of the sex trafficking, M.A. has been diagnosed with anxiety, depression, severe post-traumatic stress disorder (PTSD), and complex post-traumatic stress disorder (C-PTSD). (*Id.* at 77:21-24; 78:20-23). Her emotional and mental state have caused physical issues as well, including sinus tachycardia, meaning she has "an abnormally high heart rate." (*Id.* at 187:15–24). She suffers from nightmares, loss of sleep, loss of appetite, panic attacks, anxiety attacks, and memory lapses. (*Id.* at 192:21–193:3; *id.* at 293:15-17; *see also* Expert Report of Abigail M. Judge, ECF No. 562-1 at 99 (describing the criteria for severe post-traumatic stress disorder that M.A. met as a result of her trafficking, including "loss of memory for certain parts of the trauma")).[10]

## B. Arrest and Conviction of L.W.

In January 2017, M.A.'s second trafficker, L.W., was indicted on two counts of sex trafficking, including trafficking M.A. for sex by force, fraud, or coercion, in violation of 18 U.S.C. § 1591. (ECF No. 3). He ultimately pled guilty to the charge involving M.A. *See United States v.*

---

[10] Ash objects to the expert report of Dr. Abigail M. Judge, Ph.D., a psychologist who assessed M.A., as irrelevant. But where, as here, expert reports are offered by Plaintiff—the non-moving party—"the relevant inquiry is whether the evidence submitted in non-admissible form during the summary judgment stage 'will be reduced to admissible form at trial.'" *Raimey v. City of Niles*, 676 F. Supp. 3d 547, 562 n. 10 (N.D. Ohio 2022), *aff'd sub nom. Raimey v. City of Niles, Ohio*, 77 F.4th 441 (6th Cir. 2023) (quoting *DeBiasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (quotation marks and citation omitted)). *See also Northgate Lincoln-Mercury Inc. v. Ford Motor Co.*, 507 F. Supp. 3d 940, 952 (S.D. Ohio 2020) ("[T]echnical rulings on the admissibility of evidence have no place in a summary judgment procedure[] and . . . any doubts regarding the admissibility of any evidence should be resolved in favor of admissibility." (internal quotation marks and citation omitted)). Because Defendants do not suggest that the opinions contained in any of the expert reports are "incapable of being reduced to admissible form," *see id.*, their objections are overruled.

*White*, No. 2:17-cr-00021, ECF No. 24 (S.D. Ohio, May 19, 2017). Pursuant to the plea agreement, L.W. agreed that he "knowingly harbor[ed], maintain[ed], provid[ed] and transport[ed] M.A., in or affecting interstate commerce, knowing and in reckless disregard of the fact that force, threats of force, and/or coercion would be used to cause M.A. to engage in commercial sexual activity." *Id.* This Court subsequently sentenced L.W. to 15 years in federal prison and a life term of supervised release. (ECF No. 562-13, Sentencing Tr. 8:15–16).[11]

## C. Civil Proceedings

On March 8, 2019, M.A. sued the hotel entities associated with the properties in which she was trafficked, seeking to hold them liable under the beneficiary prong of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a). Specifically, she claims that hotel defendants: (1) "knowingly benefit[ed], financially or by receiving anything of value"; (2)

---

[11] Ash objects to L.W.'s criminal documents as irrelevant, arguing that L.W. never trafficked M.A. at its property. (*See* Ash Reply, ECF No. 572 at 4). Although "[i]rrelevant evidence is not admissible," Fed. R. Evid. 402, "[t]he rules regarding relevancy . . . are quite liberal[.]" *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998). "Evidence is relevant . . . if it has *any* tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." *Id.* (quoting Fed. R. Evid. 401). In determining relevancy, a court may not "consider the weight or sufficiency of the evidence . . . and '*even if* a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth.'" *Id.* (citation modified) (quoting *Douglass v. Eaton Corp.,* 956 F.2d 1339, 1344 (6th Cir.1992), *overruled on other grounds by Weisgram v. Marley co.*, 528 U.S. 440 (2000)). A district court has "very broad discretion in making this determination." *United States v. LaVicto*r, 848 F.3d 428, 444 (6th Cir. 2017) (quoting *United States v. Semrau*, 693 F.3d 510, 523 (6th Cir. 2012)). Here, even if L.W., who met M.A. at the Ash Property, did not traffic her there, L.W.'s indictment and sentencing transcript are still relevant to Plaintiff's proposition that she is "a victim of this chapter" under 18 U.S.C. § 1595(a). Ash's objection is thus overruled. S&S, for its part, summarily raises a hearsay objection, but it does not explain further. (ECF No. 570 at 2–3). In any event, both documents appear to fall within some exceptions, including the public records exception under Rule 803(8). *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1300 (11th Cir. 2022) (finding that foreign "indictment [] meets the requirements of the public records hearsay exception under Rule 803(8)"); *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 412 (6th Cir. 2006) ("The notices of arrest, Korean complaint, and the investigative reports are generally admissible under the public-records exception, as set forth in Rule 803(8)."). The Sixth Circuit has further observed that, where an indictment leads to a conviction, it may be admissible under the hearsay exception of Rule 803(22) (judgment of a previous conviction). *See Mike's Train House*, 472 F.3d at 412 ("Several courts have held that an indictment from a previous conviction is properly included within the scope of Rule 803(22) and is thus admissible despite being hearsay.").

from participating in a venture; (3) that they "knew or should have known" was engaged in sex trafficking. The original complaint named nine defendants, including S&S.[12]

As set forth in her original complaint, Plaintiff alleges that "[f]rom approximately the spring of 2014 until August 2015, she was repeatedly trafficked for sex at Days Inn by Wyndham, Comfort Inn, and Crowne Plaza properties in the Columbus, Ohio area." (*Id.* ¶ 51). She alleges that her traffickers "often requested rooms near exit doors"; "the trash cans in the rooms . . . would contain an extraordinary number of used condoms"; she was often instructed "to refuse housekeeping services"; and the hotel rooms "were frequently paid for with cash." (*Id.*). She further alleges that the hotels ignored "obvious signs of human trafficking," including "physical deterioration, no eye contact, and duration of stay," and failed to recognize the "indicators of commercial sex activity," like "bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, cash payments)." (*Id.* ¶ 53). Plaintiff also alleges that

---

[12] Those defendants are:

    (1) Wyndham Hotels and Resorts, Inc. ("Wyndham"), as hotel brand and operator of Days Inn by Wyndham;

        a. S&S Airport Motel, LLC ("S&S"), d/b/a "Days Inn by Wyndham - Columbus Airport," 750 Stelzer Road, Columbus, Ohio 43219;

        b. KRRISH Lodging, LLC ("Krrish"), d/b/a "Days Inn by Wyndham - Grove City Columbus South," 1849 Stringtown Road, Grove City, Ohio 43123;

        c. First Hotel Management, LLC ("FHM"), d/b/a "Days Inn by Wyndham - Columbus East Airport," 2100 Brice Road, Reynoldsburg, Ohio 43069;

    (2) Inter-Continental Hotel Group ("IHG"), as hotel brand and operator of Crowne Plaza;

        a. Columbus Hospitality, LLC ("CH"), d/b/a "Crowne Plaza Columbus - Downtown, an IHG Hotel," 33 East Nationwide Boulevard, Columbus, Ohio 43215;

        b. TJM Columbus, LLC ("TJM"), d/b/a "Crowne Plaza Columbus North - Worthington," 6500 Doubletree Avenue, Columbus, Ohio 43229;

    (3) Choice Hotels International, Inc. ("Choice Hotels") as hotel brand and operator of Comfort Inn; and

        a. Buckeye Hospitality, Inc. ("Buckeye"), d/b/a "Comfort Inn Columbus," 1213 East Dublin Granville Road, Columbus, Ohio 43229.

she "observed some of the same hotel staff over the course of the time she was trafficked for sex at the Defendant hotel properties, and the hotel staff would have or should have observed visible physical changes, such as bruising, to the Plaintiff's appearance." (*Id.* ¶ 54). She was also "routinely escorted by her trafficker in view of the front desk after her trafficker paid in cash for the reserved room out of which the sex trafficking venture was housed," and that hotel staff ignored "her desperate pleas and screams for help, after being beaten or choked at the Defendants' hotel properties." (*Id.* ¶¶ 55). Finally, Plaintiff contends that her trafficker "operated the sex trafficking venture out of the same hotel room for multiple days or weeks in succession," whereby she was "forced into sexual encounters with approximately ten (10) 'johns' per day, and these johns would enter and leave the hotel guest room." (*Id.* ¶ 56).

Based on these allegations, this Court denied several motions to dismiss in October 2019.[13] *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019). (ECF No. 136). In so doing, this Court held that Plaintiff's allegations that "Defendants rented rooms to the trafficker" satisfied the first element of knowing benefit, because "the rental of a room constitutes a financial benefit from a relationship with the trafficker[.]" (*Id.* at 6–7). As to the second element, Plaintiff "alleged sufficient facts to show Defendants 'participated in a venture' under § 1595 by alleging that Defendants rented rooms to people it knew or should have known where engaged in sex trafficking." (*Id.*). And finally, Plaintiff's allegations "that Defendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence," in addition to allegations "specific to [M.A.'s] own sex trafficking, including a number of signs she alleges should have alerted staff to her situation" were

---

[13] The motions to dismiss were filed by Defendants Buckeye Hospitality, Inc., First Hotel Management, LLC, Columbus Hospitality, LLC, Krrish Lodging, LLC, Wyndham Hotels and Resorts, Inc., and Choice Hotels International, Inc. (ECF No. 136). Those defendants have since been terminated.

sufficient to state a claim that Defendants should have known that the venture was engaged in sex trafficking.  *M.A.*, 425 F. Supp. 3d at 968.

Plaintiff then filed an amended complaint, in February 2021, naming additional defendants, including MGH and Ash.  Whereas the original complaint stated broadly that, "[f]rom approximately the spring of 2014 until August 2015, [Plaintiff] was repeatedly trafficked for sex at Days Inn by Wyndham, Comfort Inn, and Crowne Plaza properties in the Columbus, Ohio area," the amended complaint clarified that timeline: "Beginning when she was still a minor until August 2015, the Plaintiff was repeatedly trafficked for sex at Days Inn by Wyndham and Comfort Inn, properties in the central Ohio region," and [b]eginning sometime in 2014 through 2015, Plaintiff was repeatedly trafficked for sex at the Crowne Plaza property."  (ECF No. 273 ¶ 56).  All other factual allegations remained largely the same.

Over the next several years, the parties engaged in extensive discovery.  During that process, most defendants were dismissed by stipulation or joint motion. (*See* ECF Nos. 349, 450, 453, 464, 536, 546, 579).  The three defendants that remain are MGH, Ash, and S&S, who operated the "Days Inn Columbus East Airport" on 2100 Brice Road, Reynoldsburg, OH ("MGH Property"); the "Days Inn Columbus North" on 1212 E.  Dublin Granville Road, Columbus, OH ("Ash Property"); and the "Days Inn Columbus Airport" on 750 Stelzer Road, Columbus, OH ("S&S Property"), respectively, during the relevant time period. (*See* ECF No. 273 ¶¶ 11, 13, 16).

On October 8, 2024, MGH, Ash, and S&S each moved for summary judgment. (ECF Nos. 551, 558, 559).  Plaintiff filed an omnibus response, opposing all three motions. (ECF No. 562). Defendants replied and raised evidentiary objections. (ECF Nos. 570, 571, 572).  On December 6, 2024, Plaintiff moved to file a sur-reply to address those objections (ECF No. 577), which

Defendants S&S and Ash opposed (ECF Nos. 582, 584).  On August 6, 2025, this Court heard oral argument on the motions for summary judgment.  This matter is now ripe for resolution.

## II.     LEGAL STANDARD

Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.  P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citing *Mt.  Lebanon Pers.  Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  That is, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In evaluating the evidence, a court "draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party." *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000)).  Although "[t]he disputed issue does not have to be resolved conclusively in favor of the non-moving party," that party must present "some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

## III.     ANALYSIS

Defendants argue that summary judgment is proper because Plaintiff fails to present any evidence to support her beneficiary claims under Section 1595. (*See generally* ECF Nos. 551, 558, 559).  Plaintiff, on the other hand, maintains that there are disputed issues of material facts and

attaches over 400 pages of evidence in support. (*See generally* ECF No. 562).  Defendants each raised evidentiary objections in their replies, challenging the relevance and admissibility of the evidence.  To address the evidentiary objections, Plaintiff moved to file a sur-reply. (*See generally* ECF No. 577-1). Because the information in the sur-reply "provides the Court with additional helpful information on issues in dispute," Plaintiff's motion for leave to file a sur-reply is **GRANTED.** *See City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F.  Supp. 971, 974 (S.D. Ohio 1993).

Proceeding to the motions for summary judgment, this Court begins by reviewing the landscape and history of the TVPRA, before turning to the parties' substantive arguments.  For the reasons explained below, this Court finds that Plaintiff has raised triable issues of material fact with regard to her claims under Section 1595(a) against all three defendants and **DENIES** Defendants MGH, Ash, and S&S's motions for summary judgment. (ECF Nos. 551, 558, 559).

## A.  Overview of the TVPRA

Congress first enacted federal antitrafficking legislation through the Trafficking Victims Protection Act of 2000, which created federal criminal offenses for trafficking-related conduct, including forced labor and sex trafficking.[14] Pub. L. No. 106–386, 114 Stat. 1464 (Oct. 28, 2000) (as amended and codified in 18 U.S.C. §§ 1589, 1590, and 1591).  Section 1591, at the time, made it a crime to engage in acts of "recruit[ing], entic[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing]" an adult, or to "benefit, financially or by receiving anything of value, from participation in a venture which has engaged in [such] an act," while "knowing that force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act."  See 18 U.S.C. § 1591 (2000).  Three years later, Congress added the civil remedy provision, Section 1595, which

---

[14] Pub. L. No. 106–386, 114 Stat. 1464 (Oct. 28, 2000) (as amended and codified in 18 U.S.C. §§ 1589, 1590, and 1591).

allowed victims of "violation[s] of sections 1589, 1590, and 1591" to "bring a civil action against the perpetrator." Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108-193, 117 Stat. 2875 (Dec. 19, 2003) (enacting 18 U.S.C. § 1595 (2003)).[15] In 2008, Congress expanded the scope of civil liability, both in terms of who could sue *and* who could be sued. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, 122 Stat 5044 (Dec. 23, 2008). Specifically, under Section 1595, a victim of any "violation of this chapter" could now bring a civil action against, not only perpetrators of TVPRA violations, but also "whoever knowingly benefits" from "participation in a venture" that they "knew or should have known" was engaged in TVPRA violations. *See* 18 U.S.C. § 1595(a) (2008). Notably, the 2008 amendments also lowered the *mens rea* standard for criminal sex trafficking: Whereas the earlier version required the government to prove that a defendant had actual knowledge of force, fraud, or coercion, the 2008 statute attached criminal liability for "reckless disregard of the fact, that means of force, threats of force, fraud" were used in acts of sex trafficking. *See* 18 U.S.C. § 1591 (2008).

Over the next decade and a half, Congress continued to expand and strengthen the reach of its antitrafficking efforts. *See* Justice For Victims of Trafficking Act Of 2015, PL 114-22, 129 Stat 227 (May 29, 2015) (adding "advertising" to the prohibited criminal conduct in Section 1591 and extending statute of limitations for minors in Section 1595); Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat 1255 (April 11, 2018) (defining "participation in a venture" in Section 1591 to sharpen criminal liability for facilitators of sex trafficking and expanding Section 1595 to authorize state attorneys general to bring "parens patriae" actions based on § 1591 violations); Abolish Trafficking Reauthorization Act of 2022,

---

[15] Pub. L. No. 108–193, 117 Stat. 2875 (Dec. 19, 2003)

Pub. L. No. 117–347, 136 Stat. 6199 (Jan. 5, 2023) ("clarifying" that civil liability in Section 1595 extends to anyone who "attempts or conspires to benefit" from a trafficking violation).

Plaintiff brings her claims against MGH, Ash, and S&S under Section 1595(a), but the parties do not address which version of the statute applies. The only version referenced in any briefing is the 2008 version. (*See e.g.*, ECF No. 551; see also ECF No 136 at 4–5). Generally, courts apply the law that was in effect at the time of the relevant conduct. *Zuern v. Tate*, 938 F. Supp. 468, 472–73 (S.D. Ohio 1996) ("The legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." (citing *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990)). Here, the alleged trafficking began in 2013 and continued through at least August 2015. (*See* ECF No. 562 at 7; M.A. Dep. at 209:19-22, ECF No. 550). It is therefore conceivable that the 2015 version of Section 1595 applies to Plaintiff's claims. But because the 2015 amendments only altered the statute of limitations for minors bringing civil claims,[16] the law did not "change the substance of the statute as pertinent here." *See United States v. Afyare*, 632 F. App'x 272, 275 n. 1 (6th Cir. 2016). The civil lability standard, in other words, is the same under both versions. *See* 18 U.S.C. § 1595(a) (2008); 18 U.S.C. § 1595(a) (2015).

Since neither party has raised the issue, this Court will use the 2008 version of Section 1595 "in order to maintain consistency with the parties' [] arguments" and this Court's prior analysis. *Afyare*, 632 F. App'x at 275 n. 1. In relevant part, Section 1595(a) provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter).

---

[16] *Compare* 18 U.S.C. § 1595(c) (2008) ("No action may be maintained under this section unless it is commenced not later than 10 years after the cause of action arose."), *with* 18 U.S.C. § 1595(c) (2015) ("No action may be maintained under this section unless it is commenced not later than the later of . . . . 10 years after the cause of action arose; or . . . . 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.").

18 U.S.C. § 1595(a). Defendants take issue with Plaintiff's status as "a victim of a violation of this chapter," as well as the sufficiency of her evidence to show that they "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture," which they "knew or should have known has engaged in an act in violation of this chapter." This Court addresses each argument in turn.

### B. "Victim of a Violation of this Chapter"

Section 1595 empowers any "victim of a violation of this chapter" to bring a civil action based on TVPRA violations. 18 U.S.C. 1595(a). The referenced "chapter" in Section 1595 includes criminal prohibitions on sex trafficking, peonage, slavery, forced labor, and other forms of human trafficking. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552 n.3 (7th Cir. 2023).

M.A. brings this action as "a victim of a violation" of Section 1591, the criminal sex trafficking provision, based on the trafficking she allegedly endured at the hands of L.W. and L.R. MGH argues that M.A. fails to qualify as a "victim" within the meaning of Section 1595, raising both legal and fact-based challenges. First, MGH contends that "a criminal conviction of a plaintiff's trafficker under the TVPRA is a condition precedent to civil liability under 18 U.S.C. § 1595(a)," reasoning that Section 1595 "specifically uses the word 'violation' and 'crime' in the context of the violation of a criminal code." (*See* MGH Mot. for Summ. J., ECF No. 551 at 12 n.6). Accordingly, in MGH's view, Plaintiff can only pursue civil claims against a trafficker who has been formally charged or convicted of a sex trafficking crime. Because only L.W. was convicted of sex trafficking M.A., MGH contends that any civil claims based on L.R.'s trafficking must fail.

This argument is a familiar one, one that this Court has rejected in the context of the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255. *See T.E. v. Wyndham Hotels &*

*Resorts, Inc.*, No. 2:22-CV-3185, 2024 WL 474400, at *10 (S.D. Ohio Feb. 7, 2024); *In re Hotel TVPRA Litig.*, No. 2:22-CV-1924, 2023 WL 3075851, at *7 (S.D. Ohio Apr. 25, 2023). Like Section 1595, the CAVRA provides a civil right of action to a "victim of a violation" of 18 U.S.C. § 1591 "who suffers personal injury as a result of such violation." 18 U.S.C. § 2255(a). Relying on *Prewett v. Weems*, 749 F.3d 454 (6th Cir. 2014), this Court concluded that the word "violation" in the CAVRA does not mean "conviction." *See T.E.*, 2024 WL 474400, at *10; *In re Hotel TVPRA Litig.*, 2023 WL 3075851, at *7.

For context, the defendant in *Prewett* was convicted of one child abuse crime based on seven child pornography videos found on his phone. The district court ruled that the defendant violated the underlying child pornography statute seven times, based on the seven videos, and the minimum damages awarded for a violation should be multiplied seven times. *Id*. at 457–58. On appeal, the defendant argued that he should be liable for only one damage award because he was only convicted on one count. *Id*. Holding that "violation" does not mean "conviction," *id*. at 459, the Sixth Circuit explained:

> *First*, the customary meaning of violation tends toward the broad (any failure to conform to a legal standard) rather than the narrow (a criminal conviction). *See, e.g.*, Oxford English Dictionary Online (3d ed. 2012) ("Infringement or breach, flagrant disregard or non-observance of some principle or standard of conduct or procedure". . . ; Black's Law Dictionary (9th ed. 2009) ("An infraction or breach of the law; a transgression . . . [or t]he act of breaking or dishonoring the law; the contravention of a right or duty.") . . .
>
> *Second*, . . . the neighboring provisions of § 2255 use "violation" and "conviction" distinctively, suggesting that the different words have different meanings. Section 2255 applies when a victim shows a "violation" of the relevant criminal provisions, but the related criminal-forfeiture statute applies only when the government shows the defendant was "convicted of an offense."

> *Compare* 18 U.S.C. § 2253, with 18 U.S.C. § 2255 (emphases added) . . .

> ***Third***, . . . [a]ddressing RICO's civil-remedies provision, which also contains a "violation" requirement, the Supreme Court held that the statute's language gave "no obvious indication that a civil action can proceed only after a criminal conviction." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 488 (1985) [internal citations omitted]. The [Supreme] Court reasoned that "the term 'violation' does not imply a criminal conviction . . . [but rather] refers only to a failure to adhere to legal requirements." *Id*. at 489.

*Id*. at 458. Thus, "a violation," the court concluded, "is not synonymous with a conviction." *Id*.

The Sixth Circuit's reasoning applies with equal force to Section 1595. First, "the customary meaning of violation tends toward the broad (any failure to conform to a legal standard) rather than the narrow (a criminal conviction)." *Prewett*, 749 F.3d at 458. Second, like Section 2255, the neighboring provisions of Section 1595 use "violation" and "conviction" distinctively. *See e.g.*, 18 U.S.C. § 1594 ("The court, in imposing sentence on any person ***convicted of a violation*** of this chapter . . . ." (emphasis added)); *see also* 18 U.S.C. § 1593(a) ("As used in this ***section***, the term 'victim' means the individual harmed as a result of a ***crime under this chapter*** . . . ." (emphasis added)). Finally, by requiring that the civil action be stayed "during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim," 18 U.S.C. § 1595(b)(1), the language of Section 1595 gives "no obvious indication that a civil action can proceed only after a criminal conviction." *Prewett*, 749 F.3d at 458 (quoting *Sedima*, 473 U.S. at 488). On the contrary, Section 1595 contemplates the possibility of a civil action being filed prior to the criminal action. *See* 18 U.S.C. § 1595(b)(1).

Had Congress intended civil TVPRA plaintiffs to be victims of only those convicted of trafficking crimes, it would have said so. *Cf. USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 96 n.1 (6th Cir. 1982) ("If Congress had intended to limit liability under [the civil RICO

provision] only to those convicted of or charged with RICO crimes, it would have done so within [that provision] by . . . specifically indicating that a conviction . . . is a basis for civil damages."). Rather, "[t]he text evidences Congress's intent to broaden the behavior that can form the basis of civil liability to participation in ventures where the defendant 'knew or should have known' that the venture was involved in sex trafficking." <u>M.A.</u>, 425 F. Supp. 3d at 964. The legislative history supports this reading. As discussed above, with each amendment and reauthorization, Congress repeatedly and deliberately chose to expand the scope of liability for sex trafficking conduct.

Consistent with this statutory reading, the Seventh Circuit in *G.G.* observed that "[c]ourts unanimously agree that a civil defendant under Section 1595 need not have violated Section 1591." *G.G.*, 76 F.4th at 552 n.3. There, the plaintiff sought to hold Salesforce liable under the TVPRA for providing advice and software to Backpage, a now-defunct website that hosted advertisements posted by the minor plaintiff's street-level trafficker. *Id.* at 548. The district court dismissed the claims against Salesforce, and the Seventh Circuit reversed. Among other things, the Seventh Circuit found that G.G. was "a victim of violations of Section 1591" based on allegations that G.G.'s street-level trafficker "used a combination of force, fraud, coercion, enticement, alcohol and drugs to cause G.G. . . . to engage repeatedly in commercial sex." *Id.* at 552 (internal quotation marks omitted). Showing that "G.G.'s street-level trafficker *could be* criminally liable under Section 1591(a)(1)" was sufficient to allege that she was a "victim of a violation" within the meaning of Section 1595(a). *Id.* (emphasis added).

Accordingly, that L.R. was not charged or convicted of criminal sex trafficking does not preclude Plaintiff from pursuing civil sex trafficking claims involving L.R. *Cf. Sedima*, 473 U.S. at 498 (declining to interpret the term "violation" in civil RICO provision as requiring prior conviction, noting that the statute's history, policy, and text—including "Congress' self-

consciously expansive language"—supports broad reading); *see M.A.*, 425 F. Supp. 3d at 969 ("Where, as here, a statute is 'remedial,' it 'should be liberally construed.'" (quoting *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)); *see also W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1378–79 (N.D. Ga. 2023) (agreeing "with those courts who have found that a criminal investigation or conviction of the trafficker or the civil defendant is not necessary to establish a violation under the TVPRA") (citing *Lundstrom v. Choice Hotels Int'l, Inc.*, No. 21-cv-00619-PAB-SKC, 2021 WL 5579117, at *4 (D. Colo. Nov. 30, 2021)); *S.Y. v. Choice Hotels Int'l, Inc.*, No. 2:20-CV-622-JES-MRM, 2021 WL 1610101, at *4 (M.D. Fla. Apr. 26, 2021) ("There is no requirement that the sex trafficker have been convicted criminally to support a civil claim against defendants for knowingly financially benefitting from the sex trafficking.").

Even if an underlying criminal conviction is required to establish a Section 1595 claim (such that only claims involving L.W. may proceed), the record as to whether L.W. trafficked M.A. at the MGH Property is not as conclusive as MGH suggests. As explained in the next section, there is evidence that L.W. rented rooms at the MGH Property during the time he was allegedly trafficking M.A. MGH's argument that M.A. is not a "victim of a violation of this chapter" thus fails.

Because M.A. has presented sufficient evidence to show that she is a "victim of a violation of this chapter" under Section 1595, this Court proceeds to analyze the evidence supporting or negating the substantive elements of her Section 1595 claims. To prevail at trial, Plaintiff must show that MGH, Ash, and S&S each: (1) "knowingly benefit[ted], financially or by receiving anything of value"; (2) from "participation in a venture"; (3) which they "knew or should have known has engaged in an act in violation" of Section 1591. As explained below, Plaintiff raises triable issues of material fact as to each element and against each defendant.

### C. Element One: "Knowingly Benefitted"

To succeed on the first element, M.A. must show that Defendants "knowingly benefitted, financially or by receiving anything of value" from participating in the alleged venture. 18 U.S.C. § 1595(a); *see M.A.*, 425 F. Supp. 3d at 964. This Court has previously held that the "rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *Id.* at 965; *accord, T.D.P. v. Choice Hotels Int'l, Inc.*, 725 F. Supp. 3d 784, 794 (S.D. Ohio 2024).

Defendants raise two arguments with respect to this element. First, MGH insists that the knowing benefit element "require[s] a more significant *mens rea* than a *mens rea* based 'merely on the receipt of rental payments no different than those received by every other customer." (ECF No. 551 at 13). According to MGH, "merely requir[ing] that Defendant knowingly receive a financial benefit" from a relationship with the trafficker, *see e.g., H.H. v. G6 Hosp.*, LLC, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019), "seems to nullify the word 'knowingly,' which Congress specifically included in the statute." (ECF No. 551 at 13).

MGH again treads on familiar terrain, seeking "to impose a requirement of 'actual knowledge' . . . even though § 1595 does not require it"—an attempt that courts nationwide, including this one, have consistently rejected. *See T.D.P.*, 725 F. Supp. 3d at 794–95 ("The statutory language of § 1595(a) does not impose an actual knowledge requirement with respect to the trafficking, it just requires that Defendant knowingly received a financial benefit."); *W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1379 (N.D. Ga. 2023) (collecting cases).

Evidence that Defendants rented rooms to Plaintiff's traffickers or rented the rooms in which Plaintiff was trafficked is sufficient to satisfy the knowing benefit element. *See M.A.*, 425 F. Supp. 3d at 965 (finding that "the rental of a room constitutes a financial benefit from a

relationship with the trafficker sufficient to meet this element of the § 1595(a) standard"); *A.B.*, 484 F. Supp. 3d at 936 ("The 'knowingly benefits financially' element of § 1595 'merely requires that Defendant knowingly receive a financial benefit' and the rental of a hotel room—or royalties from that rental—constitutes a financial benefit sufficient to meet this element.'").

On this point, all three defendants harp on the absence of stay records at their properties that bear M.A.'s name or the names of her traffickers.  MGH's argument in this regard is not entirely accurate because, as MGH itself acknowledges, there are records of L.W. renting rooms at the MGH Property for two nights on February 28, 2014; one night on May 16, 2014; and one night on June 7, 2014  (*see* ECF No. 551-2 at 3–5; ECF No. 551 at 9 n.3 (noting that "hotel registration documents have been produced showing that trafficker [L.W.] rented a hotel room at the Days Inn on Brice Road . . . .").  This evidence is nonetheless irrelevant, according to MGH, because L.W. "did not traffic `M.A. at this hotel, per her own testimony." (*See* ECF No. 551 at 9 n.3; *see also* MGH Reply, ECF No. 571 at 3 ("M.A. specifically testified that she was never trafficked by [L.W.] at the Brice Road Days Inn owned by Defendant MGH.  Rather, she alleges she was trafficked only by L.[R.] [] at that particular property.")).

Even if a jury believes MGH's version of events—that *only* L.R. trafficked M.A. at the MGH Property—Detective Dennis, who "personally investigated the criminal sex trafficking case against L.W., which also involved . . .  M.A."  has attested that the staff at the MGH Property would inadequately validate identification when renting rooms. (*See* Dennis Decl. ¶¶ 13-14, ECF

No. 562-1 at 412–16).[17]  Viewed most favorably to Plaintiff, this evidence may lead a reasonable jury to conclude that L.R. rented rooms at the MGH even in the absence of stay records in his name.

Plaintiff's deposition testimony as to whether L.W. trafficked her at the MGH Property, moreover, is not as conclusive as MGH suggests.  When asked about the MGH Property, M.A. testified that L.R. took her to the MGH Property but that she could not recall if L.W. did too. (*See* ECF No. 550 at 295:1–6).  Curiously, MGH relies solely on M.A.'s testimony to establish that L.W. never trafficked M.A. at its property only to turn around and attack the reliability of that testimony. (*See e.g.*, ECF No. 551 at 13 –14 ("Plaintiff's own memory of staying at the hotel (to the extent she has any) strongly suggests she is mistaken about having stayed there.  For instance, her description of the property omits key features of the property that any guest should have observed.").  MGH points out, for example, that M.A. does not remember the "full-size bar and restaurant with its own, well-marked entrance at the front of the hotel"; the swimming pool that "would have been plainly visible to anyone staying in most of the guest rooms"; or the "parking lot at the rear of the hotel."  (*Id.*).

---

[17] MGH objects to the relevance of Detective Dennis's sworn declaration.  According to MGH, although "Mr. Dennis might be an important witness as to some of the plaintiff's claims against hotels in which [L.W.] trafficked her," M.A. "specifically testified that she was never trafficked by [L.W.] at the Brice Road Days Inn owned by Defendant MGH." (ECF No. 571 at 3).  As explained above, however, there is a jury question as to whether L.W. trafficked M.A. at the MGH Property.  Moreover, an affidavit or declaration may be used to show that a fact is genuinely disputed so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Here, Detective Dennis attests that he "personally investigated the criminal sex trafficking case against L.W., which also involved . . . M.A.";  served subpoenas to the MGH Property; "recall[s] providing [MGH] employees with red flag information"; and had "personal knowledge that employees at 2100 Brice Road would inadequately validate identification when renting rooms." (*See generally* ECF No. 562-1 at 412–416).  He is also prepared to testify if called at trial and he "would testify consistent with the facts stated herein." (Decl. of Aaron Dennis at ¶ 24).  The declaration is therefore proper summary judgment evidence under Rule 56.

To be sure, lapses in memory alone do not create a genuine dispute of fact. *Pratt v. Brown Mach. Co., a Div. of John Brown*, 855 F.2d 1225, 1233 (6th Cir. 1988). M.A., moreover, does not dispute that she does not remember all the specifics about her experience. (ECF No. 561 at 13). But she attributes her inability to recall to the trauma she endured and notes that she has been "deposed multiple times" and "cross-examined by at least ten defense attorneys about [the] traumatic time in her life." (*Id.*). Her expert psychologist, Dr. Abigail Judge, corroborates M.A.'s explanation. (*See* ECF No. 562-1 at 99 (opining that as a result of the severe post-traumatic stress disorder, M.A. suffers "loss of memory for certain parts of the trauma."). And M.A. herself recognized her recall problems during deposition:

> Q.     How many times do you have an actual memory of being at
>          the [MGH] Days Inn on Brice Road?
>
> A.     Unfortunately, very few, just because of the whole situation.
>          It all – excuse my language – has become one big hell . . . .

(*Id.* at 293:15-17). Any gaps or inconsistencies in Plaintiff's testimony bear on M.A.'s credibility, which a jury, not this Court, must decide. *See Anderson*, 477 U.S. at 255 (noting "credibility determinations" are inappropriate at the summary judgment stage); *Johnson on behalf of X.M. v. Mount Pleasant Pub. Sch.*, 745 F. Supp. 3d 479, 498 (E.D. Mich. 2024) ("In a case which largely hinges on Plaintiff's own testimony, such testimony may present genuine, and potentially dispositive, competency concerns for this Court to assess pretrial. Should the case proceed to trial, such testimony may also present genuine questions of Plaintiff's credibility.").

Credibility aside, the evidence viewed most favorably to M.A. raises a triable issue as to whether MGH knowingly benefitted from her trafficking by L.W. M.A. testified that she left L.R. "[s]ometime before" a June 4, 2014 incident at the Crowne Plaza hotel involving L.W. (*See* M.A. Dep. 147:8–15; 262:14–21, ECF No. 550). There is also evidence showing that L.W. rented a

room at the MGH Property three days after that incident. Finally, Plaintiff could have frequented the MGH Property without necessarily seeing the back parking lot, the restaurant at the front entrance of the hotel, or the swimming pool. As MGH itself notes, Plaintiff's trafficker "normally parked in one of the side parking lots"; that M.A. "would walk in . . . through the lobby *or through a side entrance*," and that she had navigated the hotel with "her head down, focused on getting where she needed to go." (ECF No. 551). Plaintiff has also described other features of the hotel that MGH does not dispute, including how the building looked from the outside; the number of floors; the lobby and front desk; the businesses across the street; the room interior and furniture; the bathrooms; and other specific attributes of the hotel. (*See* M.A. Dep. 287:3–293:12, ECF No. 550).

Based on all this evidence, a reasonable jury could conclude that L.W. trafficked M.A. at the MGH Property and that MGH received a financial benefit from the trafficking. Plaintiff has therefore presented sufficient evidence to raise a material question of fact as to whether MGH knowingly benefitted from M.A.'s trafficking.

Like MGH, Ash argues that there is "no admissible evidence that L.R. ever paid [Ash] Days Inn North for a room by way of cash, credit card or anything of value." (*See* ECF No. 558 at 11). M.A., however, testified that the Ash Property was L.R.'s "home base"; that she was trafficked there over 50 times; that L.R. did not reserve rooms in advance; that the "john's" sometimes booked the rooms; and that the rooms were paid for in cash. (M.A. Dep. 260:22–261:6, ECF No. 550). A reasonable jury could find Plaintiff's testimony compelling and, given that "john's" booked the rooms, the absence of stay records in L.R.'s name justified. As the Seventh Circuit observed, "Section 1595 uses the passive voice: 'Whoever knowingly benefits . . .'" and thus "does not [] require that the sex trafficker itself or himself provide any benefit." *G.G.*, 76

F.4th at 565 (quoting 18 U.S.C. § 1595(a))). Thus, a reasonable jury could conclude that Ash received a financial benefit from M.A.'s trafficking even without stay records.

Finally, as to S&S, Plaintiff testified that she was trafficked at the S&S Property over 30 times. (M.A. Dep. 328:23–329:11, ECF No. 550). S&S disputes M.A.'s account, noting that Plaintiff stated that the rooms at the S&S Property would have been rented under either L.R. or L.W.'s names and that she was not aware of any pseudonyms or aliases they used. (*Id.* at 344:23–345:10). Because S&S "has carefully reviewed all its reservations during the period M.A. alleged she was trafficked at [S&S's] hotel property and is unable to locate even a single reservation in the names of M.A. or either of the traffickers she has identified," S&S argues there is no question that it did not receive a knowing benefit from M.A.'s trafficking. (ECF No. 559 at 8). But the fact that S&S has identified evidence discrediting or contradicting M.A.'s account does not warrant a grant of summary judgment in its favor. Such evidence, again, goes to M.A.'s credibility, which a jury must judge.

In summary, Plaintiff's deposition testimony as to all three properties is extensive and indicates, among other things, that M.A. did not book the rooms in which she was trafficked; that L.R. did not reserve rooms in advance; that john's sometimes booked the rooms; and that the rooms were paid for in cash. (*See* M.A. Dep. 287:8–4, 295:7–17 (MGH), 273:15–274:9 (S&S), 89:19–92:23 (Ash), ECF No. 550). A jury could find M.A.'s testimony credible and believe her version of events—that Defendants MGH, Ash, and S&S rented the rooms in which M.A. was trafficked, even absent any stay or financial documents bearing the traffickers' or M.A.'s names.

Defendants, of course, are free to cross-examine Plaintiff and her witnesses at trial, but Plaintiff's account of events is not so blatantly contradicted by the record such that no reasonable jury could believe her version of the facts. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  The evidence in the record raises at least a genuine issue of fact as to whether Defendants MGH, Ash, and S&S knowingly received a benefit from Plaintiff's trafficking by renting the rooms in which she was trafficked.

### D.  Element Two: "Participation in a Venture"

The second requirement under 18 U.S.C. § 1595(a) is "participation in a venture." Congress has not defined the phrase under Section 1595.  In 2018, however, it amended Section 1591, the criminal sex trafficking statute, to define "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation" of Section 1591(a)(1).  *See* Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat 1255 (April 11, 2018); § 1591(e)(4)(2018).  The same law that amended Section 1591 also amended Section 1595 but did so only to authorize state attorneys general bring civil actions.  *See* Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat 1255 (April 11, 2018).

Several canons therefore support applying the ordinary meaning of "participation in a venture" under Section 1595.  First, "[w]hen Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *See Russello v. United States*, 464 U.S. 16, 23 (1983).  Second, when a statute leaves a term undefined, courts "give the term its ordinary meaning."  *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)).  Finally, "[w]here, as here, a statute is "remedial," it "should be liberally construed."  *M.A.*, 425 F. Supp. 3d at 969 (quoting *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)).

As this Court recognized in *M.A.*, the case law provides a spectrum of examples that qualify as "participation in a venture" as understood in ordinary terms. *M.A.*, 425 F. Supp. 3d at 970–71. One way to establish participation is through evidence of a direct association between the trafficking venture and the defendant. *Id.* at 970. A plaintiff, for example, can point to "acts or omissions" that "facilitated the sex trafficking venture," like a hotel renting rooms to people they knew or should have known were engaged in sex trafficking. *See id.* at 971 (allegations that hotels "rented rooms" sufficient to show "participation in a venture" under § 1595); "In the absence of a direct association," a plaintiff can adduce evidence of "a continuous business relationship" between the trafficking venture and the hotel "such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *Id.* at 970. The First Circuit's decision in *Ricchio v. McLean* helps illustrate both forms of "participation." 853 F.3d 553 (1st Cir. 2017) (Souter, J.). There, the plaintiff's allegations that the trafficker and the motel operator had prior commercial dealings and "'exchang[ed] high-fives in the motel's parking lot while speaking about 'getting this thing going again,'" after it became clear that the trafficker was engaging in "coercive and abusive treatment of [plaintiff] as a sex slave" were sufficient to show participation. *Id.* (quoting *Ricchio,* 853 F.3d at 555).

Importantly, to show "participation in a venture," M.A. need not prove that MGH, Ash, and S&S had "actual knowledge" of L.R. or L.W.'s sex trafficking venture or that they performed any "overt act" in furtherance of the sex trafficking. *See M.A.,* 425 F. Supp. 3d at 968–70 (noting that "liability under § 1595 can attach when an individual participates in a venture that is not specifically a sex trafficking venture and participation is not direct participation in the sex trafficking"); *G.M. v. Choice Hotels Int'l, Inc.*, 725 F. Supp. 3d 766, 777–78 (S.D. Ohio 2024) ("[P]articipation in a venture under § 1595 does not require an 'overt act.'").

Since *M.A.* was decided, several courts of appeal have chimed in to interpret "participation in a venture" under Section 1595 liability.[18] In *Doe # 1 v. Red Roof Inns*, for example, the Eleventh Circuit applied the "plain meaning" of "venture" and "participation" to hold that a plaintiff suing hotel franchisors must show that the franchisors "took part in a common undertaking or enterprise involving risk and potential profit" with the plaintiff's traffickers to satisfy the "participation in a venture" element. 21 F.4th 714, 724–25 (11th Cir. 2021). Specifically, the Eleventh Circuit emphasized that "observing something is not the same as participating in it," and found the allegations there—that hotel franchisors received revenue from renting rooms to the sex traffickers, oversaw operations and hotel policies, controlled the training of managers, "sent inspectors to the hotels who would have seen signs of sex trafficking," "received reviews mentioning sex work occurring at the hotels," and "took remedial action when revenue was down"—insufficient to show that the franchisors "participated in a venture" for purposes of civil liability under the TVPRA. *Id*. at 726–27.

The Seventh Circuit took a slightly different approach in *G.G.*, defining "participation" as requiring "only 'a desire to promote the wrongful venture's success,'" regardless of "actual knowledge of criminal wrongdoing." *G.G.*, 76 F.4th at 559 (quoting *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)). Guided by the remedial nature of Section 1595, the Seventh Circuit found it "safe to assume that Congress did not intend 'venture' in Section 1595, which establishes civil liability, to be any more demanding than 'venture' in Section 1591, which establishes criminal liability." 76 F.4th at 554. A "venture," the Seventh Circuit continued, "can certainly run the gamut from an *isolated act of sex trafficking* to an international sex-trafficking enterprise." *Id*.

---

[18] The Sixth Circuit has not yet analyzed the requirements for civil beneficiary liability under Section 1595(a).

(emphasis added). As with "venture," the court proceeded to "liberally[] construe 'participation,'" explaining that it "does not require more than 'assisting, supporting, or facilitating' a venture that violates Section 1591." *Id*. at 558–59 (quoting 18 U.S.C. § 1591(e)(4)).

Consistent with this Court's reasoning in *M.A.*, the Seventh Circuit noted that "providing hotel rooms . . . would satisfy Section 1595's 'participation' element." *See id*. at 559 ("While direct involvement in sex trafficking itself (e.g., transporting victims, *providing hotel rooms*) would satisfy Section 1595's "participation" element, direct involvement goes beyond what the statutory text requires." (emphasis added)). A "continuous business relationship" would also allow "an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *Id.* at 560.[19]

Most recently, the D.C. Circuit considered the spectrum of cases to have analyzed the "participation in a venture" element under the TVPRA. *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024). Hewing most closely to the Eleventh Circuit's verbiage, the court defined "participation in a venture" as "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain." *Id.* at 415. "Although a formal business relationship is not necessary," the court observed that "something more than engaging in an ordinary buyer-seller transaction" is needed—like *Ricchio's* "common purpose, shared profits and risk, or control," or *G.G.*'s "direct and continuous relationship and [] desire to promote the wrongful venture's success." *Id.* (internal quotation marks and citations omitted). "[P]urchasing

---

[19] The facts sufficient in *G.G.* to show Salesforce's participation in Backpage's illicit venture through a close, continuous business relationship consisted of allegations that Salesforce provided Backpage with "targeted solutions addressed to the needs of Backpage's business"; repeatedly assessed Backpage's "operational needs"; and provided "active, ongoing support" that was "tailored" to those needs. *G.G.*, 76 F.4th at 560.

a commodity without more," the court opined, "is not 'participation in a venture' with the seller." *Id.*[20]

Defendants argue that Plaintiff cannot satisfy the "participation in a venture" element under any understanding of the term. Specifically, MGH argues that Plaintiff presents "no evidence that any hotel employee assisted or facilitated trafficking" by L.R.; "no evidence of a direct or continuous relationship with [L.R.] that would suggest a venture between him and MGH"; and "no objective evidence that [L.R.] even rented a room at this hotel." (ECF No. 551 at 15–16). According to MGH, the "best [M.A.] can point to" is that L.R. "rented a hotel room two or three times for short periods of time over the course of a year." (*Id.* at 16–17).

Ash likewise insists that it had no "dealings with a trafficker, or specifically, L.R.," and that no "relationship or agreement existed between them." (ECF No. 558 at 13–14). According to Ash, M.A.'s entire "participation" theory must fail because it "rests on an assumption that she should have been noticed as a trafficking victim because she walked with her head cast downward, did not make eye contact, and requested extra towels during her 2-4 day stays." (*Id.*). Finally, S&S asserts that the "only evidence in this case that any trafficking occurred at S&S's hotel is M.A.'s own testimony and she concedes that she actively took steps to avoid detection," and there is no evidence "that S&S ever, much less continuously or repeatedly, rented rooms to M.A. or M.A.'s alleged traffickers." (ECF No. 559 at 10).

---

[20] Specifically, the D.C. Circuit affirmed the dismissal of claims brought by former child cobalt minors alleging that technology companies violated the TVPRA by purchasing cobalt from suppliers who used forced labor to mine the cobalt. *See Apple*, 96 F.4th at 415. The court found the allegations insufficient to establish the companies' "participation in a venture," noting that there was "no shared enterprise between the Companies and the suppliers who facilitate forced labor"; the companies "own[ed] no interest in their suppliers"; and the companies did not "share in the suppliers' profits and risk." *Id.* The court also rejected the plaintiffs' argument that the companies' "tacit agreement" to regularly buy cobalt from these suppliers satisfied the element, the court emphasized that "purchasing a commodity, without more, is not 'participation in a venture' with the seller." *Id.*

M.A., in opposition, points to evidence that she was trafficked at the MGH Property for 20 nights (M.A. Dep. 297:1–31, ECF No. 550); that she was trafficked at the Ash Property, which was L.R.'s "home base," over 50 times, in rooms that were paid for in cash and sometimes booked by the "john's" (M.A. Dep. 260:22–261:6, ECF No. 550); and that she was trafficked at the S&S Property more than 30 times (M.A. Dep. 329:1-6, ECF No. 550). Moreover, while MGH denies any "participation" in L.W.'s sex trafficking venture, there are stay records and receipts showing that it rented rooms to L.W. on several occasions during the relevant time period. (*See* ECF No. 551-2 at 3–5 (MGH records showing L.W. rented rooms at the MGH Property for two nights on February 28, 2014; one night on May 16, 2014; and one night on June 7, 2014; ECF No. 551 at 9 n.3 (noting that "hotel registration documents have been produced showing that trafficker [L.W.] rented a hotel room at the Days Inn on Brice Road . . . .")). This evidence is sufficient to defeat summary judgment on the participation element under Section 1595. *See M.A.*, 425 F. Supp. 3d at 968–69; *G.G.*, 76 F.4th at 559 n.15.

Resisting this conclusion, Defendants insist that room rentals, without more, cannot satisfy "participation" under Section 1595. (*See e.g.*, ECF No. 551 at 16–17 & n. 7 (citing *G.W. v. Northbrook Indus., Inc.*, 739 F. Supp. 3d 1243, 1251 (N.D. Ga. 2024) (granting summary judgment in favor of the hotel defendants, finding the evidence which included, among other things, the "volume of room rentals by Plaintiff's traffickers," insufficient to establish participation because it did not show that defendants "took steps *with* Plaintiff's traffickers to facilitate the traffickers' illicit activities")).

Defendants' arguments are rooted largely in cases from the Eleventh Circuit. (*See e.g.*, ECF No. 551 at 14 (citing *I.R. v. I Shri Khodiya, LLC*, — F.Spp.3d —, 2024 WL 1928755 (N.D. Ga 2024); ECF No. 558 at 13 (citing *Doe # 1*, 21 F.4th at 726-727); ECF No. 559 at 9 (citing *J.C.*

*v. I Shri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1317 (N.D. Ga. 2022))). As one court observed, the "common thread in the Eleventh Circuit's opinions" is a requirement that the plaintiff: (1) "show at least some connection between the hotels' actions and the traffickers' actions (the *common* venture)"; and (2) "identify what actions the operator took to advance the object of the joint undertaking (*participation* in the common venture)." *G.W.*, 739 F. Supp. 3d at 1249.

In *J.C. v. I Shri Khodiyar, LLC*, for example, the court found allegations that a 15-year old girl exhibited obvious signs of a minor victim of sex trafficking, that a hotel operator "act[ed] as a lookout for [plaintiff's] traffickers," and that the girl was "forced to have sex with Defendant's employees" sufficient to satisfy the "participation in a venture" element. 624 F. Supp. 3d at 1318. Likewise, in *I.R.*, the district court denied summary judgment where the evidence showed that a hotel manager solicited the underage plaintiff and engaged in forced commercial sex in exchange for free lodging and "[d]efendants' employees took steps to facilitate the use of Defendants' premises for trafficking," including managers "go[ing] to the traffickers' rooms when trafficking victims were with adult male 'customer[s],' to see if they 'need[ed] anything,' and victims would answer the door while naked." 723 F.Supp.3d at 1337, 1341–42.

By contrast, in *C.B. v. Naseeb Invs., Inc.*, the court concluded that there was "no genuine issue of material fact as to whether [the hotel] participated in a venture, as currently defined by the Eleventh Circuit, with [the plaintiff's trafficker]." 748 F. Supp. 3d 1338, 1362–63 (N.D. Ga.2024). Specifically, the court found the evidence insufficient to show that "Defendant took any action to support or facilitate [the trafficker's] specific activities, beyond allowing him to purchase the room rental." *Id.* at 1358–59. The evidence there included that the trafficker resided at the hotel "for some time"; the hotel was "on notice" that he was a classified sex offender "because law enforcement had called days earlier to confirm his room number"; the hotel allowed him to rent a

second room in a night and allowed him to decline housekeeping for that room"; "renewed the rental of the second room for an additional night during the time [the trafficker] was trafficking Plaintiff"; "permitted, if not explicitly endorsed, housekeeping and room assignment practices that enabled prostitution"; "generally turned a blind eye to conduct that should have raised red flags as to trafficking and sexual exploitation on the property"; and "would rather (and did in fact) rent rooms to individuals engaged in illegal activity, such as prostitution, than risk its rooms sitting empty[.]" *Id.*

Unlike courts in the Eleventh Circuit, however, this Court does not read the "participation" standard to require, at a minimum, "some form of evidence of a defendant's actual knowledge of a plaintiff's presence on the property, *plus some overt act to establish the defendant's 'participation'* . . . to survive summary judgment." *Id.* (emphasis added). Quite the contrary, this Court and others have repeatedly considered—and expressly rejected—the notion that any "overt act" furthering the venture is needed to satisfy the "participation" element. *See G.M.*, 725 F. Supp. at 778 ("[P]articipation in a venture under § 1595 does not require an 'overt act.'" (citing *M.A.*, 425 F. Supp. 3d at 968–69)); *G.G.*, 76 F.4th at 559 n.15 (collecting cases and noting that the "vast majority of district courts agree" with *M.A.* that "a participant defendant need not have committed 'some "overt act" that furthers the sex trafficking aspect of the venture' or have 'associated' with the sex trafficker 'for the purpose of furthering the sex trafficking'") (quoting *M.A.*, 425 F. Supp. 3d at 968–69)).

Evidence that hotel employees acted as lookouts for the traffickers or bought sex with trafficking victims, to be sure, is akin to the allegations the First Circuit found sufficient in *Ricchio* to show the motel operator's "participation" in the alleged sex trafficking venture. *Compare Ricchio*, 853 F.3d at 555 (allegations that trafficker who held plaintiff hostage and hotel

operator"'exchang[ed] high-fives . . . while speaking about 'getting this thing going again'" sufficient to show participation) *with J.C.*, 624 F. Supp. 3d at 1318 (denying motion to dismiss TVPRA where hotel operator "act[ed] as a lookout for [plaintiff's] traffickers" and girl was "forced to have sex with Defendant's employees"); *I.R.*, 723 F.Supp.3d at 1337 (denying summary judgment where hotel manager forced underage plaintiff to engage in forced commercial sex in exchange for free lodging).

Such explicit, bordering-on-egregious actions by hotel staff, while sufficient, however, are not *necessary* to satisfy the participation element under § 1595(a). *See M.A.*, 425 F. Supp. 3d at 970–71 (rejecting defendants' reliance on *Ricchio* to argue that the "alleged conduct here cannot, as a matter of law, form the basis for 'participation in a venture' for purposes of civil liability under § 1595(a)" and emphasizing that "[t]he First Circuit explained that [*Ricchio*] did not present that 'summary [of the facts] as necessarily exhausting every variant of statutory violation and basis for [TVPRA] civil liability'") (quoting *Ricchio*, 853 F.3d at 557)); *see also G.G.*, 76 F.4th at 559 ("While direct involvement in sex trafficking itself (e.g., transporting victims, *providing hotel rooms*) would satisfy Section 1595's 'participation' element, direct involvement goes beyond what the statutory text requires." (emphasis added)).

"Participation" simply means "taking part." *See* Participation, Black's Law Dictionary (12th ed. 2024). To require the kind of blatant, proactive acts that Defendants propose, and that suffice in the Eleventh Circuit, would be to discard the "should have known" language in Section 1595. *See M.A.*, 425 F. Supp. 3d at 968-71. Indeed, it is difficult to envision a scenario where a hotel employee serves as a "lookout" to protect a trafficker, or actively has sex with a trafficking victim, without "actual knowledge" of the trafficking. The court in *C.B.* recognized that such a construction is "far more limiting than [Section 1595's] language requires":

> [G]iven the direction of the Eleventh Circuit's case law on this element thus far[,] . . . this Court is hard-pressed to envision a factual scenario in which the Circuit would find constructive knowledge sufficient to find a defendant liable as a civil beneficiary under § 1595 . . . . [I]f 'observing' signs of sex trafficking (and even ignoring those signs) 'is not the same as participating in it,' as the Eleventh Circuit has stated, it appears to the Court that nothing less than some form of evidence of a defendant's actual knowledge of a plaintiff's presence on the property, plus some overt act to establish the defendant's "participation"— such as employees serving as lookouts — would be sufficient to survive summary judgment. *Red Roof*, 21 F.4th at 727.

*C.B.*, 748 F. Supp. 3d at 1362–63.  On a practical level, too, this Court finds no reason to distinguish between a hotel employee acting as a lookout for a trafficker and a hotel employee directly renting rooms to that trafficker.  Sex trafficking ventures cannot operate without access to physical spaces, and the act of giving a trafficker a hotel rooms is providing them with that space.  Defendants do not explain how or why this is any less "participation" than the other conduct they describe.  *Cf. G.G.*, 76 F.4th at 559 ("While direct involvement in sex trafficking itself (e.g., transporting victims, *providing hotel rooms*) would satisfy Section 1595's 'participation' element, direct involvement goes beyond what the statutory text requires."  (emphasis added)).

But even assuming that some direct act or omission beyond a room rental is required, Plaintiff also presents evidence sufficient to meet this standard.  Joyce Robinson, who managed the MGH Property from 2005 until Matthew Hwang took over in 2014, testified that she was aware that human trafficking was a problem at the property in 2014 and 2015:

> Q.    And do you understand now, as we sit here today, that human trafficking in hotels, in particular, is a problem?
>
> A.    It is.
>
> Q.    And you understood that in 2014, 2015.  True?
>
> A.    Uh-huh.  Yes, sir.

> Q. And did you understand that while you were at the [MGH] Brice Road hotel as well?
>
> A. Yes, sir, I did. In fact, I worked with the detectives in Reynoldsburg to keep the prostitutes out of my bar.

(ECF No. 555 at 37:8–23). She further indicated that she would have used the tools to combat human trafficking if she had been given them. (*Id.* at 68:4–6). In fact, when she was managing the MGH Property, she worked with the detectives in Reynoldsburg "to keep the prostitutes out of [her] bar." (*Id*. at 37:19–23). When asked about the difference between a prostitute "who was voluntarily engaging in sex work" and someone "engaging in sex work under fraud, coercion, bribery, et cetera," Ms. Robinson testified that it was "all the same" to her, "because prostitution isn't always voluntary." (*See id.* at 68:18–25; *see also* Arthur Lin Dep. 164:22 – 165:4 (noting it would be "very difficult to distinguish between prostitution and sex trafficking")). According to Robinson's testimony, when Mr. Hwang took over the MGH Property in 2014, he "took away [the] security" and "took away [the] undercover detectives." (*Id.* at 44:14–45:8). As Robinson explained:

> We used to have security on Friday and Saturday nights. Our bar at one time was very popular and it would bring in the whole neighborhood besides the guests in the hotel. Once he took over, I wasn't allowed to have security anymore, even though I asked for it.

(*Id*.). A reasonable jury, faced with this testimony, could conclude that Hwang's removal of security measures that potentially curbed prostitution and sex trafficking at the MGH Property— against Robinson's advice—was an act that facilitated Plaintiff's sex trafficking and establishes MGH's "participation" in a sex trafficking venture under Section 1595. In summary, Plaintiff has presented sufficient evidence to defeat summary judgment on the "participation" element as to all three defendants.

Defendants' policy concerns that this Court's reading of the statute unduly expands liability for ordinary hotel operators and goes beyond what the TVPRA envisioned do not compel a different result. As the Supreme Court reasoned when rejecting a similar argument in the civil RICO context, "this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications." *Sedima*, 473 U.S. at 499–500 ("[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.").

In any event, regardless of the extent of Defendants' "participation," there is no liability under Section 1595 unless Defendants "knew or should have known" that the venture was engaged in sex trafficking. To the extent Defendants argue they had no reason to suspect any trafficking at their properties, their arguments sound more in the actual or constructive knowledge requirement of Section 1595, which this Court analyzes next.

### E. Element Three: "Knew or Should Have Known"

The last element under Section 1595 requires Plaintiff to show that MGH, Ash, and S&S "knew or should have known" that the venture from which they benefitted "has engaged in an act in violation of" the TVPRA. *See* 18 U.S.C. § 1595(a). To satisfy this element, M.A. need only show that "Defendants 'should have known' about the nature of the venture under a negligence standard." *M.A.*, 425 F. Supp. 3d at 966. No "evidence of actual knowledge or conspiracy between Defendants and the trafficker[s]" is required to satisfy this element. *See id.* Nor is Plaintiff required to prove "that the defendant knew or should have known of the *specific* victim who has brought the civil action." *See G.G.*, 76 F.4th at 558 (emphasis added). Evidence "that Defendants were

on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence," and evidence "specific to [Plaintiff's] own sex trafficking, including a number of signs she alleges should have alerted staff to her situation," can satisfy the negligence standard under Section 1595(a). *M.A.*, 425 F. Supp. 3d at 968.

Plaintiff has presented sufficient evidence as to all three defendants to survive summary judgment on this element. Contrary to Defendants' arguments, evidence of online complaints, trip reviews, and other information in the public domain is relevant to show that Defendants were "on notice about the prevalence of sex trafficking generally at their hotels."[21] Joyce Robinson's testimony, detailed above, further supports Plaintiff's theory that Defendants "failed to take adequate steps to train staff in order to prevent [the] occurrence" of sex trafficking. The deposition testimony of Arthur Ashraf, owner of Ash Management, likewise demonstrates an awareness that the area surrounding the Ash Property was rife with criminal activities, including prostitution and sex trafficking, which—along with other evidence in the record—could lead a reasonable jury to conclude that Ash "should have known" that sex trafficking was occurring on the property. (Ashraf Dep. 146:1–12, 182:1–10, ECF No. 557). Arthur Lin, General Manager at the S&S Property, also testified that based on the hotel's "do-not rent" lists, employees were aware of ongoing prostitution at the property. (Arthur Lin Dep. 245:18-24; 246:1-9, ECF No. 554). Detective Dennis, who "personally investigated the criminal sex trafficking case against L.W.,

---

[21] MGH argues that online reviews are "clearly hearsay evidence" and thus inadmissible. (ECF No. 551 at 20). Statements or documents that "arguably constitute hearsay," however, "may be offered . . . not for the truth of the matter asserted, Fed. R. Evid. 801, but to show notice." *Flint ex rel. Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 345 (6th Cir. 2001). Additionally, "[s]tatements offered to prove the listener's knowledge are not hearsay." *United States v. Boyd*, 640 F.3d 657, 664 (6th Cir. 2011) Because MGH has not shown that the evidence to which it objects is "clearly inadmissible on all potential grounds," this Court defers its evidentiary rulings until trial "so that questions of foundation, relevancy and potential prejudice may be resolved in [the] proper context." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

which also involved . . . M.A.," attested that he educated the staff at all three properties about signs of human trafficking; served them with subpoenas; and provided their employees with red flag information. (*See* Aaron Dennis Decl. ¶¶ 7–9, 11–20, ECF No. 562-1 at 412–16).

M.A. has also presented evidence "specific to [Plaintiff's] own sex trafficking, including a number of signs she alleges should have alerted staff to her situation." *M.A.*, 425 F. Supp. 3d at 968.  Relevant here, M.A. testified:

> From Day 1.  I mean, again, there was 30[-]40 people coming in in a day to one hotel room.  And specifically, I mean, that right there is a big red flag in itself, because either, A, I'm doing something I shouldn't be, or I'm selling drugs.  The foot traffic, the disheveled room the trash cans full of condoms.  I mean, I hate to say it, no matter how long you've been married whatever, you're not going to use a whole 50-box of condoms with your significant other in a day's time.  The request for towels.  The request for sheets.  Me constantly coming and going, letting people in.  I mean, there was multiple signs just remember were irrelevant to people.  Nobody even batted an eye.  I mean . . .

(M.A. Dep. 435:22–436:12, ECF No. 550). She also testified that she interacted with staff at the Ash Property—L.R.'s "home base," where M.A. was trafficked over 50 times—and recalls asking for extra towels. (*Id.* at 275:10–14).  She further testified that she never left the S&S Property without being accompanied by her trafficker.  (M.A. Dep. 342:4-6, ECF No. 550).

To the extent that Defendants argue that this evidence is insufficient to show the "sort of pattern that might have placed reasonable persons on notice that something suspicious was occurring over the course of [M.A.'s] stays" at their properties,[22]  that is for the jury to decide.  *See Charash v. Oberlin College*, 14 F.3d 291, 300 (6th Cir. 1994) ("Generally, notice, including constructive notice, is an issue of fact, and is normally determined by a jury."); *see also Kuchar v. Saber Healthcare Holdings LLC*, 340 F.R.D. 115, 121 (N.D. Ohio 2021) (noting that "constructive

---

[22] *See* ECF No. 551 at 20; *see also* ECF No. 558 at 16; ECF No. 559 at 20–21.

knowledge is an issue best suited to a jury") (citing *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 391–92 (6th Cir. 2016)).

Denying summary judgment would not, as Defendants suggest, offend the purpose or policy underlying the TVPRA. Defendants cannot insulate themselves from statutory liability by consciously avoiding information that would otherwise constitute constructive knowledge for purposes of establishing negligence under Section 1595(a). *See United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 903 n.32 (11th Cir. 2003) ("[I]t is clear that a party should not be able to avoid constructive knowledge and shield itself from statutory liability by consciously avoiding information which would constitute constructive knowledge and result in liability."); *United States v. Bohn*, 281 F. App'x 430, 439 (6th Cir. 2008) (noting that "defendant's knowledge of a particular fact may [] be inferred from the defendant's deliberate ignorance or willful blindness to the existence of that fact") (citing *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000)); *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *7 (6th Cir. Feb. 2, 2009) (holding that prison official's "avoidance of knowledge does not permit [official] to escape liability" for deliberate indifference to medical needs under Section 1983).

Viewed most favorably to M.A., the evidence suggests that, despite the ubiquitous presence of prostitution at Defendants' properties and Defendants' awareness of sex trafficking indicators, Defendants failed to take appropriate security measures; to install cameras in certain parts of the hotel; to train staff to recognize red flags; and to implement anti-trafficking policies or measures. (*See* Arthur Ashraf Dep. 153:20–155:5, ECF No. 557; Arthur Lin Dep. 20:6–21:17, 156:13–19, 244:5–249:9, 253:16-19, ECF No. 554; Joyce Robinson Dep. 37:8–40:17, ECF No. 555; Dennis Decl. ¶¶ 16–17, 20, ECF No. 562-1 at 412–16). A reasonable jury could therefore conclude that Defendants "fail[ed] to implement policies sufficient to combat a known problem" in their

operations such that their conduct "rise[s] to the level of willful blindness or negligence" under Section 1595. *See M.A.*, 425 F. Supp. 3d at 968.

Because Plaintiff has presented sufficient evidence to raise genuine issues of material fact as to whether MGH, Ash, and S&S "knowingly benefit[ed] . . . from participat[ing] in a venture which [they] [] knew or should have known has engaged in an act in violation" of Section 1591, 18 U.S.C. 1595(a), Defendants' motions for summary judgment are denied.

## IV.    CONCLUSION

For the foregoing reasons, this Court **GRANTS** Plaintiff's Motion for Leave to File a Sur-Reply (ECF No. 577) and **DENIES** Defendants' motions for summary judgment. (ECF Nos. 551, 558, 559).


**IT IS SO ORDERED.**


**ALGENON L.  MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  September 22, 2025**